# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2020-CA-01407-COA

**RAY BARBOUR JR.**                                                    **APPELLANT**

**v.**

**SINGING RIVER HEALTH SYSTEM**                                        **APPELLEE**
**EMPLOYEES' RETIREMENT PLAN AND**
**TRUST**

DATE OF JUDGMENT:              12/01/2020
TRIAL JUDGE:                   HON. D. NEIL HARRIS SR.
COURT FROM WHICH APPEALED:     JACKSON COUNTY CHANCERY COURT
ATTORNEY FOR APPELLANT:        WILLIAM HARVEY BARTON
ATTORNEY FOR APPELLEE:         CHARLES J. MIKHAIL
NATURE OF THE CASE:            CIVIL - STATE BOARDS AND AGENCIES
DISPOSITION:                   AFFIRMED - 04/05/2022
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

**BEFORE CARLTON, P.J., WESTBROOKS AND McCARTY, JJ.**

**WESTBROOKS, J., FOR THE COURT:**

¶1.     Ray Barbour Jr. filed a complaint for a declaratory judgment in the Chancery Court

of Jackson County, Mississippi, to obtain disability benefits from the Singing River Health

System Employees' Retirement Plan and Trust (the Plan). The chancellor held that Barbour

was not entitled to the benefits he sought because he was not employed with Singing River

Health System (SRHS) at the time of his injury.[1] We affirm the chancellor's decision.

---

[1] Health System Employees' Retirement Plan and Trust, the Appellee, will be referred
to as "the Plan"; Health System Employees' Retirement Plan and Trust Agreement will be
referred to as the "Retirement Agreement"; and Singing River Health System will be
referred to as "SRHS."

**FACTS AND PROCEDURAL HISTORY**

¶2.     On June 25, 1990, Ray Barbour was hired by SRHS as its Assistant Director of Environmental Services and Laundry. Barbour participated in a mandatory retirement agreement in which he became fully vested after ten years of employment with SRHS. The Retirement Agreement included some provisions pertaining to disability. In 2012, SRHS decided to outsource its janitorial and environmental services to Sodexo Corporation. Barbour, who by then was the Director of Environmental Services and Laundry, was terminated from his employment on August 31, 2012, and immediately undertook substantially the same job for Sodexo, a vendor at the same hospital. After working for Sodexo for approximately two years, Barbour injured his back while working at the hospital when he fell off a ladder. He received workers' compensation and was terminated from his employment with Sodexo when he returned to work. The Social Security Administration declared Barbour disabled as of April 1, 2015.

¶3.     In December 2015, Barbour notified the chief of human resources at SRHS of his disability and formally requested information about drawing disability retirement benefits.[2] He never received a response. He then contacted a human resources director at SRHS and was told to request information from Transamerica, the fiduciary for the Plan. According to Barbour, Transamerica told him that it could not make an eligibility decision and that he would need to reach out to SRHS. The record contains no discussion of any attempt by

---

[2] During this time, Barbour was also a member of a class-action lawsuit against SRHS based on its failure to fully fund the Plan. This lawsuit did not have any effect on his eligibility for disability under the Retirement Agreement.

Barbour to contact SRHS again. He filed a complaint for a declaratory judgment against the Plan on September 19, 2019.[3] At no point did Barbour acknowledge that his claim was denied, and the record contains no documentation of a denial. However, in its answer, the Plan stated that Transamerica denied Barbour's claim on December 29, 2015, because he was not an active employee of SRHS when he was injured.

¶4.    Only two witnesses testified at the hearing—Barbour and Tracy Miller-Christian, the special fiduciary for the Plan. Barbour testified (and Miller-Christian agreed) that he was vested in the Plan because he had worked for SRHS for at least ten years prior to his termination, and he had a right to his accrued retirement benefit. Barbour further testified that he had read the Retirement Agreement and could find nothing specifically stating that he had to be an employee of SRHS at the time he was injured to collect disability under the Retirement Agreement.

¶5.    Miller-Christian (who had been working in the area of defined-benefit pension plans for over thirty years) testified that in order to qualify for disability benefits via the Plan, one had to be an employee at the time of injury. In response to the chancellor's questioning, she admitted there was no concise statement of this qualification in the Retirement Agreement. She did, however, point to language she believed supported the Plan's position. Miller-Christian said that her interpretation of Section 5.05 of the Retirement Agreement—which defines "Retirement Disability Date"—is what indicates to her "that you need to be working [when you are injured] because your actual retirement as a result of disability is what deems

_____

[3] The complaint for a declaratory judgment pertained only to disability benefits, as the Plan has been paying Barbour retirement benefits since July 2018.

3

you to have a disability retirement date." Miller-Christian also pointed to Section 6.01, which states, "A member shall have a non-forfeitable right . . . to his accrued retirement benefit derived from employer contributions provided he has completed ten or more years of service. . . ." Miller-Christian further stated that this is how the Retirement Agreement has been consistently applied; although since her involvement in 2017, she could not recall another similar instance.

¶6. At the conclusion of the hearing on August 7, 2020, the chancellor asked the parties to "address the issue of interpretation of the contract as to this specific language" and submit post-trial memorandums of law, which they did.[4] In his ruling on December 1, 2020, the chancellor stated that the Retirement Agreement was ambiguous, but he stopped short of pointing out which provisions he found ambiguous. He stated that no "testimony, evidence, proof, nor parol evidence" was presented at trial, and he found no authority that would entitle Barbour to disability benefits under the facts presented. As a result, the chancellor ultimately held that because Barbour's injury occurred after the termination of the employer-employee relationship, he could not recover disability benefits under the Retirement Agreement. Barbour now maintains that the chancellor's decision should be reversed and rendered.

## STANDARD OF REVIEW

¶7. We "appl[y] a de novo standard of review to questions of law, including a motion for

---

[4] The chancellor did not indicate what "specific language" he was referring to in his directive to the parties. However, because his request for additional briefing came immediately after his exchange with Miller-Christian about the phrase "actual retirement" and whether the Retirement Agreement said that one had to be an employee at the time of injury to collect disability, we find this connection to be the most logical one.

a declaratory judgment." *S.C. Co. v. Keymon*, 974 So. 2d 226, 229 (¶9) (Miss. 2008). This is also the standard of review when a contract is presented for interpretation on review. *Cherokee Ins. Co. v. Babin*, 37 So. 3d 45, 48 (¶8) (Miss. 2010). When a contract is ambiguous, its interpretation is "a question of fact for the trier of fact which we review under a substantial evidence/manifest error standard." *Tupelo Redevelopment Agency v. Abernathy*, 913 So. 2d 278, 283 (¶12) (Miss. 2005).

## ANALYSIS

¶8.     Barbour's appeal focuses on two alleged errors: the chancellor (1) applied the wrong standard of review and (2) held that the Retirement Agreement was ambiguous.

### I.     Incorrect Standard of Review

¶9.     Barbour maintains that the chancellor applied the wrong standard of review. Specifically, the chancellor's judgment included language about the Plan's vesting decision-making authority with Miller-Christian (who did not personally make the decision to deny Barbour's claim) and an abuse-of-discretion standard of review. When a retirement plan that is subject to the Employee Retirement Income Security Act of 1974 (ERISA)[5] bestows discretionary authority upon the plan administrator "to make eligibility determinations or construe the plan's terms, the appropriate standard of review is for abuse of discretion." *Walker v. Wal-Mart Stores Inc.*, 159 F.3d 938, 939 (5th Cir. 1998). But our review of the record indicates that the subject Retirement Agreement is structured to meet the requirements of Section 401(a) of the Internal Revenue Code of 1986, and thus, as a government plan and

---

[5] Pub. L. No. 93-406, 88 Stat. 829 (codified as amended at 29 U.S.C. § 1001 *et seq.*).

as pointed out by Barbour, it is exempt from the dictates of ERISA. *Smith v. Reg'l Transit Authority*, 827 F.3d 412, 417 (5th Cir. 2016). Despite the fact that the chancellor's judgment referenced Miller-Christian's decision-making authority as well as an abuse-of-discretion standard of review, we find no indication that the chancellor actually gave any deference to Transamerica's decision to deny Barbour's claim or Miller-Christian's opinion that this was the correct interpretation of the Retirement Agreement. As is appropriate when a fact-finder renders an opinion on a complaint for a declaratory judgment, the chancellor stated that he took into account all testimony and evidence (including the Retirement Agreement and additional briefing), and he "could find no authority" in support of Barbour's argument. If any error occurred, it was harmless because the chancellor did not defer to Transamerica's decision or to Miller-Christian's opinion.

## II.     Retirement Agreement and Ambiguity

¶10.    At the outset of this case, neither Barbour nor SRHS maintained that the Retirement Agreement was ambiguous. The Plan's special fiduciary Miller-Christian did not testify that the Retirement Agreement was ambiguous—only that she wished its "language was more clear. . . ." It was not until Barbour's post-trial memorandum that ambiguity was mentioned. In the chancellor's ruling, he did not specify which, if any, provisions of the Retirement Agreement he found to be ambiguous. We have studied the Retirement Agreement as a whole and find that its language, while not as precise as one might wish, is not ambiguous, especially as it relates to Barbour's status as a member. When a contract is "unambiguous, its meaning should be determined, irrespective of the construction of the parties." *Griffin v.*

6

*Md. Cas. Co.*, 213 Miss. 624, 632, 57 So. 2d 486, 489 (1952).

¶11.   The Retirement Agreement contains no express language regarding the novel question Barbour sets forth: Must a person be an employee of SRHS at the time of an injury and subsequent disability in order to be eligible for disability benefits under the Retirement Agreement?  An analysis of the following provisions of the Retirement Agreement shows that the lack of express language does not, in and of itself, render the Retirement Agreement ambiguous:

- Section 1.14 of the Retirement Agreement specifically defines an "Employee" as "a person who is employed by [SRHS] on the basis of an Employer-Employee relationship, is classified as Full-time and typically is scheduled to work thirty-six (36) or more hours per week." It is undisputed that Barbour was not an employee at the time of his injury and subsequent disability.

- Section 1.15 of the Retirement Agreement specifically defines "Employer" as "[SRHS,] a . . . County owned and operated general hospital[.]" It is undisputed that Barbour was terminated from SRHS on August 31, 2012. It is also undisputed that Sodexo, not SRHS, was Barbour's employer at the time of his injury and subsequent disability.

- Section 1.19 of the Retirement Agreement states that a "'Member' shall mean an Employee who becomes a Member pursuant to Article III and who continues to be entitled to any benefits under the [Retirement Agreement]." During Barbour's employment with SRHS, he became a Member of the Retirement Agreement.

- Section 1.29 gives a more specific definition for a "Retired Member," stating that a "'Retired Member' shall mean a former Member of the [Retirement Agreement] who is entitled to Retirement Benefits under the [Retirement Agreement]." In July 2018 (after he became disabled), Barbour took early retirement under the Retirement Agreement, thus becoming a Retired Member entitled to retirement benefits. This section makes no mention of disability benefits.

- Also instructive are Sections 1.31 and 1.32, which discuss "Service"

7

and the "Severance From Service Date." "Service" is "the period of an Employee's employment considered in the determination of his eligibility for membership and for certain benefits under the Retirement Agreement, in accordance with Section 2.01." Severance from service is determined when the earliest of several events occurs—in this instance Barbour's termination on August 31, 2012.

- Section 2.01 sets forth parameters for calculating the period of service needed to "determin[e] a Member's non-forfeitable interest in his Accrued Retirement Benefit Derived From Employer Contributions . . . . " Again, no mention is made of disability benefits.

- Keeping in mind that the definition of "Employee" in Section 1.14 (set forth above) specifies that a person must be employed *by SRHS* for thirty-six or more hours per week to qualify as an employee, Section 4.06 clearly contemplates the need to make a determination of disability only for employees, as it specifies that "similarly situated employees will be treated uniformly . . . ." It logically follows that to be an employee for whom SRHS could make a disability determination for purposes of Section 4.06, the injured worker must actually be an employee of SRHS. It is undisputed that Sodexo, not SRHS, was Barbour's employer at the time of his injury and subsequent disability. Thus, Section 4.06's language about "The Disability Retirement Date of Member" is not applicable to Barbour because he was no longer a Member for any purpose except the non-forfeitable retirement benefits.

- Section 5.05(a) provides in relevant part that "the Employer may require that a Member receiving Disability Retirement Benefits submit to re-examination by a qualified physician selected by the Committee at reasonable times prior to age sixty (60) in order to determine whether such member continues to be Disabled. . . ." In construing Section 5.05(a) with the definition of "Employer" as set out in Section 1.15 above, it is clear that a relationship between Barbour and SRHS would have to exist in order for him to qualify for disability benefits under the Plan. Section 5.05(a) anticipates SRHS being the employer when a determination is made regarding eligibility for disability benefits. It is undisputed that Sodexo, not SRHS, was Barbour's employer at the time of his injury and subsequent disability. Additionally, because Barbour does not have a disability retirement date from SRHS under Section 4.06, Section 5.05(a) is inapplicable.

- Section 6 applies to retirement benefits exclusively. Section 6.01

8

provides that "[a] Member shall have a non-forfeitable right to his Accrued Retirement Benefit Derived From Employer Contributions provided he has completed ten (10) or more years of service. . . ." While the Plan's fiduciary relied on Section 6.01 to deny Barbour disability benefits, notably there is no mention of disability in Section 6.01 or anywhere in Section 6. For these reasons, we disagree with Judge Wilson's separate opinion and do not find Section 6.02 applicable. Clearly, Barbour is entitled to retirement benefits, but he is not entitled to disability benefits from SRHS.

¶12. As a result of his termination, Barbour ceased to be a Member of the Retirement Agreement for anything other than retirement benefits. It is clearly stated in numerous provisions that retirement benefits under the Retirement Agreement are non-forfeitable. The same is not true of the ability to qualify for disability benefits. Barbour's termination resulted in his forfeiture of any rights to disability benefits from SRHS. Plainly stated, Barbour was not an employee of SRHS at the time of his injury and subsequent disability, so he does not qualify for disability benefits under Section 5.05. Based on the language contained in the Retirement Agreement, we see no ambiguity; thus, there is no need to address Barbour's argument concerning extrinsic or parol evidence. The chancellor's ruling, though not arrived at in the most straightforward manner and technically in error, was in accordance with the terms and provisions of the Retirement Agreement and is affirmed. "It is the customary practice, in the name of judicial economy, for an appellate court to affirm the trial court if the right result is reached even though for the wrong reason[,]" and we will follow this practice today. *Towner v. State*, 837 So. 2d 221, 225 (¶9) (Miss. Ct. App. 2003).

## CONCLUSION

¶13. The fact that the chancellor referenced an incorrect standard of review and held that

9

the Retirement Agreement is ambiguous, though improper, does not change the ultimate outcome of this case. The chancellor correctly held that Barbour was not entitled to the benefits he sought because he was not employed by SRHS at the time of his injury.

¶14. **AFFIRMED.**

**BARNES, C.J., CARLTON, P.J., GREENLEE AND McDONALD, JJ., CONCUR. McCARTY AND SMITH, JJ., CONCUR IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION. EMFINGER, J., CONCURS IN RESULT ONLY WITHOUT SEPARATE WRITTEN OPINION. WILSON, P.J., CONCURS IN PART AND IN THE RESULT WITH SEPARATE WRITTEN OPINION, JOINED BY SMITH AND EMFINGER, JJ.; McCARTY, J., JOINS IN PART. LAWRENCE, J., NOT PARTICIPATING.**

**WILSON, P.J., CONCURRING IN PART AND IN RESULT:**

¶15. The judgment of the chancery court should be affirmed because Section 6.02 of the Retirement Agreement makes clear that a member whose employment at SRHS terminates prior to his retirement is not entitled to a "Disability Retirement Benefit." Section 6.01 of the Retirement Agreement provides in relevant part that "[a] Member shall have a non-forfeitable right to his Accrued Retirement Benefit Derived from Employer Contributions provided he has completed ten (10) or more years of Service[.]" There is no dispute that Barbour was vested under Section 6.01 because he completed more than ten years of service at SRHS. Section 6.02 then provides:

> 6.02 AMOUNT OF BENEFIT UPON TERMINATION OF EMPLOYMENT PRIOR TO RETIREMENT: If a Member who has a non-forfeitable right pursuant to Section 6.01 above, shall have a Severance From Service Date[6] prior to his Retirement Date and other than by reason of death,

---

[6] Under Section 1.32, an employee's "Severance From Service Date" is defined as "the earlier of (a) the date on which: an Employee quits, retires, is discharged or dies, and (b) the last day of a period in which an Employee remains absent from service (with or

he shall be entitled to receive either:

> (a) Commencing on his Normal Retirement Date, one hundred percent (100%) of his Accrued Retirement Benefit, determined in accordance with Section 5.01, and based upon his Average Earnings and Credited Service on his Severance From Service Date;

> (b) Commencing on his Early Retirement Date, as selected by the Member, the Retirement Benefit calculated in accordance with the foregoing Paragraph (a), reduced by three (3) percent for each year, if any, that the commencement date of such benefit precedes the Member's Normal Retirement Date; or

> (c) As of his Severance From Service Date, a lump sum payment of his Accumulated Contributions if elected by the Member, in accordance with the provisions of Section 8.09, in which case his Accrued Retirement Benefit Derived from Employer Contributions shall be cancelled, and he shall not be entitled to any further benefits under the [Retirement Agreement].

Section 6.02 is controlling with respect to Barbour's right to benefits under the Retirement Agreement because his "Severance From Service Date" occurred prior to his "Retirement Date." Thus, under Section 6.02, Barbour was entitled to choose among three options: (a) his full retirement benefit beginning on his "Normal Retirement Date"; (b) a reduced retirement benefit beginning on his "Early Retirement Date"; or (c) a lump sum payment of his accumulated contributions to the Plan. A "Disability Retirement Benefit" is *not* among the options available to members such as Barbour, whose employment with SRHS ended prior to his retirement. Therefore, the chancery court correctly ruled that Barbour was not entitled to a "Disability Retirement Benefit." And although I do not agree with the majority's analysis of various other provisions of the Retirement Agreement, I concur that the judgment

without pay) with the Employer for any reason other than quitting, retirement, discharge or death, such as vacation, holiday, sickness, disability, leave of absence or layoff."

11

of the chancery court should be affirmed based on the plain language of Section 6.02.[7]

**SMITH AND EMFINGER, JJ., JOIN THIS OPINION. McCARTY, J., JOINS THIS OPINION IN PART.**

---

[7] In her testimony in the chancery court, the Plan's court-appointed special fiduciary, Tracy Miller-Christian, cited Section 6.02 in support of her opinion that Barbour was not entitled to a Disability Retirement Benefit. However, I agree with Barbour and the majority that the chancery court erred by citing an ERISA case, *Walker v. Wal-Mart Stores Inc.*, 159 F.3d 938, 939 (5th Cir. 1998), for the proposition that Christian's interpretation is reviewed only for an abuse of discretion. The Plan is not an ERISA plan, so ERISA's abuse-of-discretion standard is inapplicable. Rather, "it is a question of law for the court to determine whether a contract is ambiguous and, if not, enforce the contract as written." *Royer Homes of Miss. Inc. v. Chandeleur Homes Inc.*, 857 So. 2d 748, 751 (¶7) (Miss. 2003).